J-S22003-21
J-S22004-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: L.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: N.L.A.B., MOTHER | : | |
| | : | No. 381 MDA 2021 |

Appeal from the Order Entered March 17, 2021
In the Court of Common Pleas of Adams County
Civil Division at No(s):  CP-01-DP-0000003-2019,
RT-11-2020

| | | |
|---|---|---|
| IN RE: L.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: N.L.A.B., MOTHER | : | |
| | : | No. 548 MDA 2021 |

Appeal from the Order Entered March 17, 2021
In the Court of Common Pleas of Adams County
Civil Division at No(s):  RT-11-2020

BEFORE:   PANELLA, P.J., McCAFFERY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PANELLA, P.J.:          **FILED: August 13, 2021**

N.L.A.B. gave birth to L.S. in July 2011. After having minimal contact with L.S. for nearly three years, Mother resumed custody when L.S.'s Father became ill and passed away in 2017. In January 2019, the trial court declared

---

[*] Retired Senior Judge assigned to the Superior Court.

L.S. dependent due to Mother's substance abuse, mental health, and homelessness, as well as L.S.'s truancy. On March 17, 2021, the trial court terminated Mother's parental rights to L.S. and changed L.S.'s goal to adoption. Mother filed amended separate appeals from these orders. As the appeals concern the same factual background, we have consolidated them and affirm both the termination of Mother's parental rights and the change of L.S.'s permanency goal to adoption.[1]

We apply a deferential standard of review in appeals from orders terminating parental rights:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted). Our standard of review for order changing a permanency goal is the same in all pertinent aspects. *See Interest of H.J.*, 206 A.3d 22, 25 (Pa. Super. 2019).

---

[1] Mother initially filed only a single appeal from the order. After this Court alerted Mother to the implications of *Commonwealth v. Walker*, 185 A.3d 969 (Pa. 2018), Mother filed separate, amended notices of appeal.

Section 2511 of the Adoption Act governs the involuntary termination of parental rights. **See** 23 Pa.C.S.A. § 2511. It requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

**In re L.M.**, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Here, the court terminated Mother's parental rights pursuant to Section 2511(a)(2), (5), (8), and (b). We need only agree with the court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm. **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We conclude the court's decision is justified pursuant to Section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > **(2)** The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> > …

- 3 -

> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

The trial court's decision to change L.S.'s permanency goal requires consideration of factors similar to those set forth in subsection 2511(b). If the court found that reunification with Mother was not in L.S.'s best interests, it was empowered to change L.S.'s permanency goal to adoption. ***See H.J.***, at 25.

Here, the record amply supports both a goal change and termination of Mother's parental rights. Mother's failure to secure stable housing, continued drug abuse, and failure to address her mental health issues has left L.S. without proper parental care and supports an inference that Mother can not or will not remedy these problems. Further, L.S. is bonded to his foster parents and his developmental, physical and emotional needs and welfare will be best served by termination of Mother's parental rights and adoption by his foster family.

From October 2014 to June 2017, L.S. lived with his father, and had only sporadic contact with Mother. ***See*** N.T. 2/22/21, at 85. Just prior to

father's death in June 2017, Mother resumed custody of L.S. due to father's deteriorating health. *See id*. However, Mother often left L.S. in the sole care of his paternal grandfather. *See id*., at 87. During these periods, which could last as long as three months, paternal grandfather would have minimal, if any, contact with Mother. *See id*.

In December 2018, Adams County Children and Youth Services ("CYS") received a referral about L.S. due to truancy and potential homelessness. *See id*., at 14. Mother acknowledged that L.S. was not attending school regularly, but did not provide a satisfactory excuse for his absences. *See id*., at 15. Further, Mother acknowledged that she was fighting her eviction from her current home, and that she had recently been without water service due to unpaid bills. *See id*.

Mother subsequently lost her eviction battle and moved to a local homeless shelter. *See id*. CYS subsequently received a report that Mother had left 7-year-old L.S. unsupervised at the shelter overnight while she went to a local hospital. *See id*., at 15-16. CYS sent a social worker to the hospital to check on Mother. After confirming with medical professionals that Mother was competent to speak to her, the social worker asked Mother about her arrangements for L.S. while she was in the hospital. *See id*., at 16. Mother did not provide an answer and ordered the social worker to leave the room. *See id*. CYS immediately took custody of L.S. *See id*.

On January 22, 2019, CYS was granted protective custody of L.S. Two days later, emergency legal and physical custody of L.S. was transferred to CYS, and L.S. was placed with his teacher. *See id*., at 17. A subsequent drug screen revealed methamphetamines in Mother's system; she did not have a valid prescription for methamphetamines. *See id*. Mother consistently refused to allow CYS to review her medical records so that CYS could understand her needs. *See id.*

Mother subsequently found temporary housing with a family in Adams County. *See id*., at 172. CYS transferred L.S. to Mother's care while she lived with the family. *See id*., at 173. While staying with the family, Mother would leave and not come back for several days, leaving L.S. in the family's care without preparation. *See id*., at 178. The family paid for several bills while Mother lived with them. *See id*., at 179. In July 2019, Mother left the home for good, taking L.S. with her. *See id*., at 173, 179. She left all of her belongings, including birthday presents L.S. had recently received. *See id*., at 179.

Mother took L.S. to his paternal grandfather's home in Luzerne County and left him there. *See id*., at 88. L.S. stayed with paternal grandfather for over a month until school started. *See id*., at 92. Paternal grandfather had no contact with Mother for the entire time. *See id*. L.S. was deemed truant at his school in Adams County, and CYS contacted paternal grandfather to locate L.S. *See id*.

On August 29, 2019, CYS took physical custody of L.S. once again. *See id*., at 139. At paternal grandfather's suggestion, CYS placed L.S. with his current foster family. *See id*.

Mother did not keep CYS apprised of her residence for several months. *See id*., at 153. In October, Mother was briefly incarcerated for failing to pay outstanding fines. *See id*., at 157. And then in December, she was briefly incarcerated before posting bail. *See id*.

Mother's housing situation improved before the holidays through the assistance of a stranger, D.S. After being released from jail, Mother encountered D.S. at a convenience store close to the prison. *See id*., at 34. D.S. noticed that Mother had prison papers and was standing in the rain without a jacket. *See id*., at 34-35. After a brief discussion, D.S. learned of L.S. and Mother's desire to be reunited with her child. *See id*., at 35. Amazingly, D.S. knew L.S.'s current foster family. *See id*., at 38. D.S. gave Mother a ride to a local business and asked to her to contact him to let him know she was safe. *See id*., at 37. Two days later, Mother texted him to let him know she was safe. *See id*.

Two weeks later, Mother contacted D.S. and informed him that she was homeless. *See id*. D.S. convinced his family to provide temporary shelter for Mother while she got her life in order. *See id*., at 38. He informed her that it was not a permanent residence, but that she could stay with his family for about a week. *See id*.

At first, it seemed like Mother was improving. ***See id***. However, D.S. quickly noticed that Mother had a tendency to vary aspects of her history when talking to people. For example, he detailed Mother's contradictory explanation for her incarceration:

> Like, it wasn't bad checks that she was in jail for. It was using somebody else's credit card. … I said, [w]ait a minute. You told me you wrote bad checks.
>
> She's like, [n]o, I didn't write bad checks. A friend of mine let me use his credit card. … Everything she told us about her, about her mom, her dad, [L.S.], you know, [L.S.'s] dad, the stories started completely changing. … [F]lags started to go up [for] us.

***Id***., at 39-40. Further, D.S. discovered Mother was stealing items out of his family's home. ***See id***., at 40.

In March 2020, Mother left D.S.'s home to allegedly live with a friend in York. ***See id***., at 44. Shortly thereafter, however, D.S. received a call from a doctor at York Hospital. ***See id***., at 45. Mother had been admitted and named D.S. as a contact. ***See id***. The doctor informed D.S. that Mother was negative for Covid-19 but seemed to be convinced she was suffering from the disease. ***See id***. The doctor informed D.S. that Mother would be released in a few days. ***See id***.

After getting off the phone with the doctor, D.S. received a call directly from Mother. She told D.S she was Covid-19 positive and had received a tracheotomy. ***See id***. Aggravated by Mother's lies, D.S. informed her that she was no longer welcome in his home. ***See id***.

From March 2020 to June 2020, CYS had no notice of Mother's whereabouts. *See id*., at 155. After communicating with Mother's probation officer, CYS attempted to contact her at several other addresses, to no avail. *See id*., at 156.

In September 2020, Mother's probation officer informed CYS that she was living with a friend in York. *See id*., at 156. A CYS social worker went to that address in October, but Mother would not let him in the building. *See id*. Mother was upset that the probation officer had found marijuana in her friend's bedroom on a prior occasion, and therefore refused to allow the social worker in. *See id*. Mother never contacted CYS to re-schedule a home visit. *See id*., at 156-157.

During most of this time, Mother refused to sign medical releases necessary to allow CYS to determine her physical and mental health needs. *See id*., at 149, 161. She failed to notify CYS when she changed addresses. *See id*., at 160. She failed to obtain any stable, legitimate employment. *See id*., at 159. After L.S. was placed with his current foster family, Mother refused to attend or cooperate with family therapy for L.S. *See id*., at 145-146.

In summary, for over 18 months Mother failed to obtain stable housing. While the court could not terminate Mother's rights if this failure was due to circumstance beyond her control, the evidence outlined above supports a finding that Mother's homelessness was not outside her control. Mother was given many opportunities to obtain stable housing and failed to take

advantage of any of them. She also failed to take any other step necessary to resume having physical custody of L.S. While she had physical custody of L.S., she failed to ensure he attended school.

Contrary to her assertions in court, Mother's behavior indicated that parenting L.S. was not a priority. Her continued inability to provide parental care is unlikely to be rectified given her apparent priorities. As such, we cannot conclude that the trial court erred in finding that CYS had established grounds for termination of Mother's parental rights under subsection 2511(a)(2) by clear and convincing evidence.

Turning to the court's consideration of L.S.'s best interests with respect to both termination of Mother's rights and changing L.S.'s permanency goal to adoption, we note psychotherapist Bruce Wilson opined that termination of Mother's rights would not have a detrimental effect on L.S. *See id*., at 77. Wilson acknowledged that L.S. has some bond with Mother, but that L.S. is aware that Mother is currently not capable of being a good parent. *See id*., at 77, 80. L.S. is doing well with his foster family, both academically and socially. *See id*., at 79. While Wilson did not have a confident opinion on what L.S.'s preference would be, he acknowledged that L.S. had not recently stated that he wanted to return to living with Mother. *See id*., at 81.

Combined with Mother's physical and mental instability detailed previously, we conclude this record supports the court's finding that termination and goal change were in L.S.'s best interests. L.S. is thriving with

his foster family, while Mother's past behavior and continued instability support an inference that L.S.'s academic and social progress would stall if he were returned to her. Furthermore, his physical health would be endangered, given the lack of stable housing and Mother's history of prioritizing her own desires over the need to supervise and care for L.S.

As we conclude that the record supports both the termination of Mother's parental rights and the change of L.S.'s permanency goal to adoption, we affirm.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/13/2021